UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

In re:  }
REGINA RAE HEAL,  }
 }  Case No. 08-40108-JJR-7
Debtor.  }

---

PAPCO, INC.,  }
 }
    Plaintiff,  }
 }
v.  }  AP No. 08-40041-JJR
 }
REGINA RAE HEAL,  }
 }
    Defendant.  }

## MEMORANDUM OPINION

This adversary proceeding came before the Court for trial on the Complaint Objecting to Discharge of Debtor (AP Doc.1, and herein the "Complaint")[1] filed by Papco, Inc. ("Papco") against Regina Rae Heal, the debtor in the above chapter 7 bankruptcy case ("Heal" or "Debtor"). The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the General Order of Reference, as amended, entered by the United States District Court for the Northern District of Alabama. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); therefore, the Court has authority to enter a final order. In compliance with Rule 7052(a) of the Federal Rules of Bankruptcy Procedure, the following shall constitute the Court's findings of facts and conclusions of law.[2]

---

[1] Pleadings and other documents filed in the adversary proceeding are identified as "AP Doc.__," while those filed in the bankruptcy case are identified as "Bk Doc.__." If a pleading or other document was filed in both the adversary proceeding and the bankruptcy case, it is identified only in the former.

[2] All "Rule" references are to the Federal Rules of Bankruptcy Procedure.

For the reasons stated below, the Court is granting the relief sought by Papco in its Complaint, and will enter an Order denying Heal a discharge in her bankruptcy case.

PROCEDURAL BACKGROUND AND FINDINGS OF FACTS:

Heal filed a petition for relief under chapter 7 of the Bankruptcy Code[3] on January 18, 2008. Papco, one of Heal's many creditors,[4] filed a Complaint in which it alleged Heal should be denied a discharge pursuant to Sections 727(a)(2)(A),(B); (a)(3); (a)(4)(B),(C),(D); and (a)(5). Sections 727(a)(2)(A) and (a)(3) have particular application to the facts in this case. Those two Sections provide that a debtor is not entitled to receive a discharge if:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
>
> > (A) property of the debtor, within one year before the date of the filing of the petition;
>
> . . .
>
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all the circumstances of the case[.]

As explained below, the trial was initially held on May 18, 2009, but at the Debtor's request the Court reopened the trial to receive additional evidence; the reopened-trial was held on October 13,

---

[3] 11 U.S.C. § 101 *et seq*, and herein the "Code." All "Section" references are to a section or subsection of the Code.

[4] Papco was awarded a judgment against Heal for almost $240,000; the judgment was entered December 10, 2007 by the Circuit Court of the City of Virginia Beach. (Plaintiff's Exh. E). Heal scheduled secured claims of almost $418,000, nonpriority unsecured claims of over $1,625,000, and unsecured priority claims of over $231,000. (BK Doc. 43).

2

2009.

The Debtor's financial troubles can be traced to the two gasoline stations she and her husband operated in Virginia. Their business was conducted through Bumble Bee, Inc., Bumble Bee 2, Inc., and Bumble Bee, LLC (collectively, "Bumble Bee"). Each of the corporations owned one of the stations, and the limited liability company owned and controlled the two corporations. According to Schedule B filed in Heal's bankruptcy case, she owned 100% of the limited liability company.[5]

Papco was Bumble Bee's fuel supplier, and also made a loan to Bumble Bee that was used to purchase one of the Virginia gas stations. Heal and her husband guaranteed the debts owed to Papco. In March 2007, Bumble Bee started having difficulty paying its obligations to Papco, and in August 2007, the parties negotiated a restructuring of the debt, which included an assignment to Papco of Bumble Bee's credit card receipts and the entry of a consent judgment in a state court lawsuit against Heal and her husband. Papco agreed not to record the judgment as long as timely payments were made on the debt. According to the Complaint, payments were made by Bumble Bee for about a month and then stopped in September 2007.

Heal testified that in December 2006, she and her family decided to move to Alabama. On February 23, 2007, she and her husband purchased a lot on Sibert Circle in the City of Southside, Alabama. Also on February 23, 2007, Heal and her husband obtained a mortgage loan from Metro Bank in the amount of $357,300 for the construction of a new house on the lot.[6] They began

---

[5]Heal testified that the limited liability company owned the two corporations; however her schedules showed that she owned the stock in the two corporations. Regardless, the ownership of the business entities is immaterial for the purposes of this opinion.

[6]Plaintiff's Exhs. A and B.

building a house and planned to move to Alabama once their new house was completed. Papco was not informed of their plans to move.

On June 25, 2007, Heal's husband formed Bumble Bee Automotive LLC, a single member, limited liability company. On the registration with the Alabama Department of Revenue he listed the business address of the LLC as 4901 Sibert Circle, Southside, Alabama 35907, and its business activity as auto repair. According to Heal, her husband intended to operate the Virginia gas stations and the new business in Alabama, and planned to commute between Virginia and Alabama in order to do so.

Heal and her husband sold their Virginia home, and on June 11, 2007, they received $33,475 from the sale (the "House Proceeds"). The House Proceeds were deposited into an account Heal maintained with the Navy Federal Credit Union in Virginia (the "NFCU Account").[7] In September 2007, Heal closed her individual retirement accounts (the "IRA") invested with American Funds and received $28,773.07 (the "IRA Proceeds"). On September 13, 2007, the IRA Proceeds were deposited into a checking account Heal maintained with Wachovia Bank (the "Wachovia Account"). Both the Wachovia Account and the NFCU Account were solely in Heal's name; they were not joint accounts with her husband.

Heal testified that shortly after the IRA Proceeds were deposited into her Wachovia Account, she wrote three checks on that account in the amount of $9,000 each: check numbers 1003, 1004 and 1005. The checks were drawn on three consecutive days: September 17, 18, and 19, 2007. The first check was payable to cash, and the latter two were payable to Heal's husband. (Plaintiff's Exh. F).

---

[7] Heal was retired from the U.S. Navy, and received both retirement and disability compensation from the Navy.

4

During the May hearing, Heal testified that all three checks, including the one payable to cash, were given to her husband, and the funds represented by the three checks were used in connection with the construction of their new house:

> Papco's attorney: "So the $27,000 went back into the house in Southside [Alabama], is that correct?"
> Heal: "Yes."
> Papco's attorney: "Do you have documentation which shows where that $27,000 went?"
> Heal: "Yes, I have receipts from appliances we had to buy for the house, we purchased dirt, which was a couple of thousand. We also had to pay the Decorator Store money out of our pocket also. Which equaled all, came up to the $27,000."

Heal's husband did not testify at the May hearing.

During the May hearing Heal attempted to explain what happened to the House Proceeds and the IRA Proceeds (together, the "Proceeds"). The best explanation she could give was a substantial portion of the Proceeds was used to make various cash expenditures, including payments to vendors for materials, fixtures and supplies used in the construction and decoration of the new Alabama house.[8] According to Heal's testimony during the May hearing, the single largest expenditure was a $27,000 cash payment to Heal's building contractor, Joey Jones Construction. The cash payment to Joey Jones was documented by a handwritten note prepared by Heal that listed four expenditures totaling $46,500.[9] Other than her handwritten note, she did not offer a receipt from Jones to confirm the $27,000 cash payment, and the other three expenditures could not be reconciled with the attached documents.

Heal also testified some of the money was used for day-to-day family expenses, and she

---

[8] According to Heal, "cash" payments were just that – payment with currency.

[9] First page of Defendant's Exh. 20.

5

attempted to account for the larger cash expenditures with a hodgepodge of receipts, hand-written notes, and copies of monthly statements for her Wachovia and NFCU Accounts. For the most part it was not possible to determine from the receipts whether payment was by cash or other means, or the amount of the purchase. With a few exceptions, the handwritten notes made by Heal were not supported by receipts or other documents.[10]

Heal's original Statement of Financial Affairs filed with her petition on January 18, 2008, did not disclose the transfer of the IRA Proceeds to her husband. On April 3, 2008, the Chapter 7 Trustee filed a Motion For Rule 2004 Examination (Bk Doc. 41), and requested that Heal produce at the examination "[c]ancelled checks and bank statements on the Wachovia bank account from two years before the case was filed through the present." The trustee filed an Amended Motion For 2004 Examination (Bk Doc. 53) on April 14, 2008, and requested production of the same documents, including the cancelled checks and statements from the Wachovia Account. Heal then amended her Statement of Financial Affairs on May 12, 2008, and disclosed two transfers in the amount of $9,000 each to her husband made on September 18 and 19, 2007, respectively.

After the May trial ended, Heal filed a Motion to Re-Open Case (AP. Doc 20) in which she stated she was mistaken about the $27,000 cash payment to her contractor. She recanted her testimony and said the payment was made by a $27,904 check drawn on the NFCU Account. A copy of the check was attached to the Motion. Papco objected to Heal's motion to re-open.

The Court initially entered an order sustaining Papco's objection (AP Doc. 31), but later vacated that order and entered a Sua Sponte Order Reopening Trial to Receive Additional Evidence

---

[10]E.g. Plaintiff's Exh. H and Defendant's Exh. 20.

(AP. Doc 36, and herein the "Sua Sponte Order").[11]  In the Sua Sponte Order, the Court attempted to provide the parties, especially Heal, some guidance with regard to the issues the Court considered essential to her receiving a discharge:

> There are two critical issues that must be resolved before the Court can determine whether the defendant should receive a discharge in her chapter 7 bankruptcy case.  First, why did she write three $9,000 checks on three consecutive days to her husband, and, with a reasonable degree of accuracy and credibility, what did he do with the money?  Second, with a reasonable degree of accuracy and credibility, what did the defendant do with the $33,475.06 proceeds from the sale of her Virginia home . . . ?
> The defendant's schedules show she is hopelessly in debt due to her failed business in Virginia, and a denial of discharge would be difficult for her to overcome. Nonetheless, under 11 U.S.C. §§ 727(a)(3), (5), to receive a discharge the defendant must have preserved sufficient financial records from which her financial condition and business transactions can be ascertained, or prove there is a reasonable justification for not having such records; and explain satisfactorily her loss of assets (i.e. the $27,000 and the $34,475.06).  Based on the testimony and documentary evidence received at trial [on May 18, 2009], the plaintiff raised a substantial issue concerning whether the defendant is entitled to receive a discharge because of her failure to maintain sufficient financial records, and credibly explain the disposition of the $27,000 and the $34,475.06.  However, there were inferences that could be drawn from the evidence that, while not sufficiently persuasive, might be expanded and further developed to answer the issues raised by the plaintiff.

Pursuant to the Sua Sponte Order, the trial was reopened on October 13, 2009, to receive additional evidence.  Heal then offered written explanations of virtually all debits, checks and deposits shown on the NFCU Account statements covering the period of April 23, 2007, through October 22, 2007, including a copy of cancelled check number 5205 dated July 31, 2007, in the amount of $27,904 payable to Joey Jones Construction (Defendant's Exhs. 1 - 6).  Heal testified she

---

[11]In *Goff v. The Russell Co. (In re Goff)*, 495 F. 2nd 199 (5th Cir. 1974), the Circuit Court remanded a case on equitable grounds to allow the District Court to consider whether the debtor should be allowed to organize his books and records and thereby avoid a denial of discharge.

7

was mistaken at the May hearing when she stated Jones had been paid in cash.[12] Based on the names of payees shown on copies of checks drawn on the NFCU Account, it did appear substantial sums were paid-out in connection with the new house constructed on Sibert Circle.[13]

Heal also changed her May testimony concerning the three $9,000 checks drawn on her Wachovia Account. In May she testified that all three checks, including the first payable to cash, were given to her husband. At the October hearing, Heal testified she personally cashed the September 17, 2007, check payable to cash, and deposited a portion of the cash back into her account.[14] When asked why she wrote three $9,000 checks on three consecutive days, Heal explained she was uncertain at the time whether she wanted to keep the Wachovia Account open or close it. Her explanation was not convincing.

At the October hearing Heal's husband testified for the first time. Mr. Heal testified he used the proceeds from two of the $9,000 checks (i.e. $18,000) to make various cash purchases, including: $6,908 to Alabama Spa on October 17, 2007, for a "Salida" spa (Defendant's Exh. 17); $4,600 to Big #1 on November 10, 2007, for the cash down payment on a new 2008 Yamaha Rhino RV (Defendant's Exh. 22); and $4,000 to Pierson Chevrolet on December 7, 2007, for the cash down

---

[12]A one-hundred bill is the largest denomination of U.S. currency available to the general public. Thus, if Heal had paid her contractor in cash as she originally testified, she would have counted out and handed over more than 270 one-hundred bills; a highly unusual event that could not have been easily forgotten or confused with payment by check.

[13]The June 23–July 22, 2007 and August 23–September 22, 2007 NFCU Account statements included copies of three checks payable to cash or the Debtor totaling $6,500.

[14]The copies of the checks drawn on the Wachovia Account were of the front sides of the checks, not the backs. Thus, it was not possible to tell from the copies who endorsed or otherwise negotiated the checks.

8

payment on a new 2008 Chevrolet Tahoe SUV (Defendant's Exh. 19).[15] The exhibits evidencing the purchases of the spa, RV and SUV were not offered at the May hearing. Mr. Heal's testimony, at least to the extent he stated he used the IRA Proceeds for the foregoing purchases, does not support his wife's May testimony in which she stated the funds transferred to her husband were used to construct their new house.[16]

CONCLUSIONS OF LAW:

*Burden of Proof*

A chapter 7 debtor is presumed to be entitled to receive a discharge under Section 727(a). *See St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 680 (11th Cir. 1993) (generally, exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor). A creditor objecting to a debtor's discharge has the burden of proving by the preponderance of the evidence that the debtor is not entitled to receive a discharge under the exceptions to discharge found in Sections 727(a)(1)–(12). Rule 4005; *Jennings v. Maxfield (In re Jennings)*, 533 F.3d 1333, 1339 (11th Cir. 2008). After a creditor proves a prima facie case establishing one or more of the grounds for denial of discharge under Section 727(a), the debtor has the burden to reasonably explain why a discharge should nonetheless be granted. *Chalik v. Moorefield (In re Chalik)*, 748

---

[15] The spa, Yamaha Rhino and Chevrolet Tahoe were not shown on Heal's schedules as being her property or owned jointly with her husband. The documents evidencing the purchase of these items all name Heal's husband as the exclusive purchaser.

[16] The Debtor's May testimony regarding the disposition of the $27,000 IRA Proceeds was unequivocal that it "went back into the house . . . ." (see page 5 *supra*). Nonetheless, during the May hearing, she identified a list prepared in her handwriting of cash expenditures (Plaintiff's Exh. H). According to the Debtor this list indicated where the $27,000 was used. The list included $4,000 for the Tahoe and $4,000 for the Rhino (Yamaha). No effort was made to reconcile the inconsistencies that appear from a juxtaposition of the Debtor's testimony at the two hearings, her husband's testimony and Exhibit H.

9

F.2d 616, 619 (11th Cir. 1984) ("At trial, the party objecting to a discharge has the burden of proving the objection. But once that party meets the initial burden by producing evidence establishing the basis for his objection, the burden shifts to the debtor to explain satisfactorily the loss. . . . To be satisfactory, "an explanation" must convince the judge. . . . Vague and indefinite explanations of losses that are based upon estimates uncorroborated by documentation are unsatisfactory.") (citations omitted).

*Section 727(a)(2)*

Code Section 727(a)(2)(A) provides that a debtor is not entitled to receive a discharge if:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –
>
> > (A) property of the debtor, within one year before the date of the filing of the petition[.]

In *Jennings v. Maxfield (In re Jennings)*, the Eleventh Circuit upheld a bankruptcy court's denial of a debtor's discharge for transferring assets with the intent to hinder, delay, or defraud creditors where the assets were transferred for the purpose of making improvements to the debtor's homestead. 533 F.3d at 1335. After the debtor had been found liable in a state court civil action, but before the state court awarded damages, the debtor transferred $130,000.00 to a builder for improvements to his property in Florida. *Id.* This payment was significantly more than the amount contractually due at the time; according to the debtor's testimony he would save money, among other benefits, by making the large prepayment. *Id.* at 1339 - 40. Further, the debtor testified that he negotiated the amount of the accelerated payment with the builder. *Id.* at 1340. According to the debtor the transfer was an attempt to utilize the Florida homestead exemption, not an attempt to

10

hinder, delay, or defraud creditors. *Id.* at 1338. The debtor's testimony had been contradicted in several key points by the builder who received the transfer; in fact, it was the debtor's "lack of candor" that primarily convinced the bankruptcy court that the debtor made the transfer with the intent to hinder, delay or defraud. *Id.* at 1340. The Eleventh Circuit determined:

> We agree with the courts below that [the debtor's] lack of candor is of great significance in determining his intent, because we do not think that the sequence of events preceding the transfer is sufficient, by itself, to establish that [the debtor] intended to hinder, delay, or defraud his creditors by increasing the value of his protected homestead. . . . [T]he bankruptcy court became convinced that [the debtor] intended to shield his money from creditors because [the debtor's] proffered 'innocent' explanations for the transfer were contradicted by [the builder]. After discrediting [the debtor's] non-fraudulent motivations, the bankruptcy court reasonably concluded that [the debtor] must have been motivated by an intent to hinder, delay, or defraud his creditors.

*Id.* at 1341.

As mentioned above, there was a conflict between the Debtor's testimony and that of her husband regarding the disposition of the IRA Proceeds. The Debtor testified they were all used in connection with the construction of the new house on Sibert Circle. Her husband testified they were used to acquire a spa, RV and SUV. The husband's testimony was supported by documentary evidence, while there were virtually no records offered to confirm the Debtor's testimony regarding the IRA Proceeds. Thus, the most credible evidence supports the husband's testimony, and the Court concludes that at least $18,000 of the IRA Proceeds were transferred by Heal to her husband approximately four months before she filed bankruptcy. The Court also concludes the transfer was made by Heal with the intent to defraud her creditors.

Additionally, the presence of several "badges of fraud" indicate the Debtor's fraudulent intent in making the transfers to her husband. Fraudulent intent is often difficult to prove by direct evidence; proof of several badges of fraud gives rise to a presumption of fraudulent intent. A

11

nonexclusive list of the indica or badges of fraud include: (1) actual or threatened litigation; (2) transfer of all or substantially all the debtor's assets; (3) insolvency; (4) special relationship with the transferee; (5) continued enjoyment or possession of the asset or its proceeds; (6) lack of consideration; (7) chronology of the events surrounding the transfer; and (8) overall lack of a reasonable justification for the transfer. *Kelly v. Armstrong,* 206 F.3d 794, 798 (8th Cir. 2000); *D.A.N. Joint Venture, L.P. v. Coady (In re Coady)*, AP No. 06-1592-BKC-PGH-A, 2008 WL 2995162, at *3 (Bankr. S.D. Fla. Aug. 1, 2008). Several of the badges of fraud were present when the transfer was made by Heal to her husband: (1) Heal was threatened with litigation by her creditors;[17] (2) the IRA Proceeds constituted a substantial portion of Heal's unencumbered assets; (3) Heal was hopelessly insolvent when the transfer was made; (4) the transfer was made to an insider, Heal's husband; (5) notwithstanding the transfer, Heal remained in a position to enjoy her husband's purchases made with the transferred money (i.e. spa, RV, SUV); (6) Heal received no consideration for the transfer; and (7) the transfer occurred while Heal's business was failing. Finally, other than an attempt to place assets beyond the reach of her creditors, there was little justification for the transfer. Indeed, the manner in which the transfer was made raised unanswered questions. The Debtor provided no good reason for transferring the IRA Proceeds from her Wachovia Account by writing three $9,000 checks on three consecutive days, other than she was contemplating closing the account. Perhaps the Debtor believed that three $9,000 checks written

---

[17]Papco obtained a judgment for almost $240,000 on December 10, 2007 (see n. 4 *supra*), and Heal's Statement of Financial Affairs lists pending suits by American Merchant Advance and Tiger Fuel.

12

on different days, as opposed to one $27,000 check, would go unnoticed.[18]   In any event, Papco carried its burden under Section 727(a)(2) by proving Heal transferred property within one year before the petition date with the intent to defraud her creditors.  The burden then shifted back to Heal, but she failed to prove the transfer was not tainted with duplicity.  Heal presented nothing more than vague, indefinite explanations not corroborated by documentation.  Such explanations are insufficient to satisfactorily explain her loss of assets.

The Court also concludes the transfer was made with the intent to hinder or delay Heal's creditors.  After the transfer of at least $18,000 of the IRA Proceeds to her husband, Heal's creditors or a trustee could have in theory avoided the transfer as fraudulent under state law or Code Section 548.[19]  Nonetheless, any meaningful recovery was highly improbable.  The IRA Proceeds were used for down payments on an RV and SUV that were heavily encumbered with purchase money debts.  They were also used to purchase a spa that presumably was installed in the newly constructed and substantially mortgaged house in which Heal claimed a homestead exemption.[20]  A recovery of the $18,000 would have required creditors to first satisfy the purchase money debts, the mortgage and the homestead exemption before being in a position to collect the equity, if there was any, in those

---

[18]Individual retirement accounts are exempt property under Section 522(b)(3)(C).  Thus, if the Debtor had not disturbed her IRA it would not have been property which the trustee or creditors could have reached.  However, after the Debtor withdrew her investment from the IRA and converted it to cash, it lost its status as exempt property.

[19]Alabama Uniform Fraudulent Transfer Act, Ala. Code § 8-9A-1 et seq. Code Section 544 gives a chapter 7 trustee all the rights and powers to avoid a transfer that are possessed by a hypothetical lien creditor.

[20]Heal's amended schedules valued the house on Sibert Circle at $398,000 and stated it was encumbered with a $356,306 mortgage. (BK Doc. 43).  Heal's equity in the house was protected to the extent of her $5,000 homestead exemption and perhaps an addition exemption of the same amount by her husband.  Ala. Code § 6-10-2.

13

assets. Creditors would have been required to make very expensive and speculative investments in these assets in hopes of recovering a comparatively small sum. Thus, the transfer to the Debtor's husband and his subsequent leveraged purchases not only hindered and delayed creditors, it effectively put the $18,000 beyond their reach.

*Section 727(a)(3)*

The Court finds that Papco also carried its burden under Section 727(a)(3). While Heal was able to adequately document transactions that were paid for through her NFCU Account, her records with regards to her cash transactions were inadequate or nonexistent. A debtor not only has the duty to keep and maintain adequate financial records, those records must be comprehensible:

> [T]he burden is not on the creditor to organize and reconstruct the debtor's business affairs. The debtor has the duty to maintain and retain comprehensible records. Creditors are not required "to shift through documents and attempt to reconstruct the flow of the debtor's assets."

*In re Juzwaik*, 89 F.3d 424, 429 (7th Cir. 1996) (citations omitted).

The Ninth Circuit confirmed that a debtor has an obligation to maintain adequate records as a condition to receiving a discharge:

> As we stated in our earlier opinion in this case, "[t]he purpose of [section 727] is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs." The initial burden of proof under § 727(a)(3) is on the plaintiff. "In order to state a prima facie case under section 727(a)(3), a creditor objecting to discharge must show (1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions." Once the objecting party shows that the debtor's records are absent or are inadequate, the burden of proof then shifts to the debtor to justify the inadequacy or nonexistence of the records.

*Lansdowne v. Cox (In re Cox),* 41 F.3d 1294, 1296 (9th Cir. 1994)(internal citations omitted).

When questioned about their cash transactions, Heal and her husband replied that the contractors and suppliers involved with building their new house preferred to be paid in cash and

14

offered discounts for cash payment. Perhaps that was true, but suspicion attaches to any substantial, undocumented cash transaction. To remove the suspicion, a debtor must produce credible supporting documentation of major cash transactions that prove the transaction was legitimate and as represented. Such documents could include dated receipts describing the purchase or transaction, preferably signed and otherwise corroborated by the nondebtor-party to the transaction.

When Heal decided to transact business on a cash basis, if she wished to preserve her privilege to receive a discharge through bankruptcy, she had a duty to maintain and preserve adequate records that would confirm the legitimacy of her transactions. Responding that contractors and suppliers preferred cash and offered discounts for cash payments was insufficient, as were self-serving, unsupported lists describing where the money went. The Court had substantial reasons to question the credibility of the Debtor's testimony: the cash transactions were made when her bankruptcy was imminent; the transfer of $27,000 from the Wachovia Account via three $9,000 checks on three consecutive days was dubious at best; Heal did not disclose the $18,000 transfer to her husband in her Statement of Financial Affairs until she was compelled to produce bank records; she recanted testimony about the cash payment of over $27,000 to her contractor; and her testimony regarding the use of the funds transferred to her husband contradicted his testimony. In light of the foregoing the Court discounts Heal's testimony and that of her husband regarding their cash transactions and explanations of why they lacked adequate records and documentation.

In this case, the Court could not help but believe it was not getting the whole story; something was amiss. It was difficult for the Court to determine exactly what Heal was attempting to accomplish during the few months before her bankruptcy. When she and her husband made the decision to move to Alabama and build a new house, they were heavily in debt as a result of their

15

failing business in Virginia. They had to have known their business could not generate enough income to halt their imminent financial collapse. According to Heal, a substantial portion of her cash went into the construction of the new house, but her husband testified at least $18,000 was used to purchase assets that were impractical to liquidate by a trustee or creditors. Heal is the one seeking a discharge, not her husband, and her records were inadequate for the Court to ascertain her true financial condition and especially the legitimacy of her financial transactions.

Failure to keep and preserve adequate financial information is reason for a denial of discharge under Section 727(a)(3), "unless such . . . failure . . . was *justified* under all the circumstances of the case." 11 U.S.C. 727(a)(3) (emphasis added). Justification under Section 727(a)(3) requires a satisfactory and reasonable explanation of why a debtor failed to keep and preserve financial information. In the context of Section 727(a), the bankruptcy court in *Poolquip - McNeme, Inc. v. Hubbard (In re Hubbard)* applied a subjective standard to determine whether debtors had justified their failure to keep and preserve financial records:

> 'The word satisfactorily . . . may mean reasonable, or it may mean that the court, after having heard the excuse, the explanation, has that mental attitude which finds contentment in saying that he believes the explanation–he believes what the bankrupts say with reference to the disappearance or shortage. He is satisfied. He no longer wonders. He is contented.'

*Poolquip-McNeme, Inc. v. Hubbard (In re Hubbard*), 96 B.R. 739, 742 (Bankr. W.D. Tex. 1989) (quoting *In re Reed*, 700 F.2d 986 (5th Cir. 1983)).

After carefully considering the evidence and searching for a justification, including the testimony of Heal and her husband, this Court is not satisfied, still wonders and is not content with the explanation given by Heal for her failure to keep and preserve adequate records of her financial affairs. Thus, Papco has proven that discharge should also be denied under Section 727(a)(3).

16

Accordingly, pursuant to Rule 9021, a separate Order will be entered in conformity with this Opinion denying Heal a discharge in this case.

Dated: December 31, 2009

/s/ James J. Robinson
JAMES J. ROBINSON
United States Bankruptcy Judge